**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bruce W Gray, et al., | No. CV-19-00004-PHX-JAT |
| Appellants, | **ORDER** |
| v. | |
| CPF Associates LLC, et al., | |
| Appellees. | |

Pending before the Court is Appellants' appeal of the bankruptcy court's Order Resolving Motion for Order to Show Cause. Having considered the parties' filings, the Court now rules on the appeal.

**I.    BACKGROUND**

This appeal involves two Chapter 11 bankruptcy petitions, one filed in May 2016 and the other in July 2016. (Doc. 26-1 at 5–6). Epicenter Partners LLC and Grey Meyer Fannin LLC are the debtor-entities that filed in May ("May Debtors"). (*Id.*). Sonoran Desert Land Investors LLC, East of Epicenter LLC, and Gray Phoenix Desert Ridge II LLC are the debtor-entities that filed in July ("July Debtors"). (*Id.* at 6). Before the start of these bankruptcy cases, Bruce Gray managed or controlled each of the May Debtors and July Debtors (collectively, "Gray Entities"). (*Id.* at 7).[1]

The Gray Entities hold separate leaseholds in the area of Phoenix known as Desert

---

[1] The Court shall refer to the Gray Entities and Bruce Gray together as "Appellants" for ease of reference and unless otherwise stated. Likewise, the Court shall refer to CPF Vaseo Associates LLC ("CPF") and R.O.I. Properties LLC ("ROI") collectively as "Appellees" unless noted differently.

Ridge—a master planned community that currently plays host to various retail, industrial, and residential properties and has plans to add more in the future. (Doc. 26-1 at 6). Desert Ridge is located on land that the State of Arizona owns and holds in trust under the terms of the Arizona–New Mexico Enabling Act. (Doc. 26-9 at 10–11). In 1993, the Arizona State Land Department bundled trust land within the Desert Ridge area into two auction packages. *See generally Campana v. Ariz. State Land Dep't*, 860 P.2d 1341, 1343 (Ariz. Ct. App. 1993). The package relevant to this case included "three leases for a total of 563 acres: (1) 332 acres of commercial core land, (2) 52 acres of resort land and (3) 179 acres of golf course land." *Id.* The State envisioned that the successful bidder for this package "would become the master developer in charge of development of Desert Ridge . . . because this bidder would have a long[-]term commitment to the community as the holder of [a] 99-year lease." *Id.* An entity known as Northeast Phoenix Partners ("NPP") won this auction and duly entered into a lease agreement with the Arizona State Land Department. *Id.* Thus, NPP became the master developer of Desert Ridge.

As the master developer, NPP had the right to "oversee and guide the development of all the property in Desert Ridge." (Doc. 26-5 at 4). Then and now, two instruments limit the alienability of the master developer's rights: the Declaration of Covenants, Conditions, Restrictions and Easements for Desert Ridge Arizona ("Master CCRs") and Commercial Lease No. 03-52415 ("Core Lease").[2] For instance, section 1.33 of the Master CCRs states:

> <u>"Master Developer"</u> shall be [NPP] . . . who simultaneously with, and immediately following, the Recording of this Declaration, shall enter into the Core Lease to Lease the Commercial Core Parcel. Any assignment by Master Developer of all or part of the Master Developer's rights, duties or obligations as master developer of Desert Ridge must be

---

[2] The briefs also discuss, but only in cursory detail, other rights arising from the Declaration of Covenants, Restrictions and Easements for Desert Ridge Commercial Core that Appellants call the "Core Declarant Rights" and Appellees call the "Master Declarant Rights." Initially, NPP held these rights as the Declarant under this instrument. The parties seem to agree that these rights are "bundled with" the master developer's rights and neither argues that different provisions of the Master CCRs or the Core Lease, or different documents altogether, govern their transfer. Thus, the Court shall refer to the totality of rights at issue here as "master developer's rights." (*See* Docs. 20 at 7 n.4; 25 passim).

> made concurrently with and appurtenant to an assignment of all or a portion of the Core Lease. The document evidencing such an assignment shall: (a) specifically set forth the scope of the obligations assigned by Master Developer; (b) be approved by Declarant, [defined as the Arizona State Land Department,] which approval shall not be unreasonably withheld; and (c) be Recorded.

(Doc. 20-3 at 12). Section 2.1 of the Core Lease also limits the alienability of the master developer's rights:

> <u>Master Developer</u>. Lessee shall be the master developer of Desert Ridge. Lessee may not assign its duties and responsibilities as master developer of Desert Ridge without the express written consent of Lessor, which shall not be unreasonably withheld. If portions of this Lease are assigned according to the provisions of Article 17, [which allows Lessee to make certain assignments to affiliated entities without Lessor's approval,] such Assignments shall not include any assignment of Lessee's obligations and duties as master developer of Desert Ridge unless the document evidencing the Assignment specifically sets forth the scope of the obligations assigned by Lessee and assumed by the Assignee and is approved by Lessor.

(Doc. 20-2 at 12). In sum, under these instruments, any purported assignment of the master developer's rights must be specific, must be appurtenant to an interest in the Core Lease, must usually be recorded, and must receive state approval.

Eventually, NPP found itself embroiled in litigation against the May Debtors. (Doc. 26-1 at 7). Ganymede Investments, Ltd. ("Ganymede") funded the May Debtors' litigation efforts. (*Id.* at 8). After a jury issued a verdict in the May Debtors' favor that exceeded $110 million, NPP and the May Debtors entered into a settlement agreement whereby NPP assigned the May Debtors a leasehold to 96.5 acres of vacant land in Desert Ridge ("the 96.5 Acre Lease") and the master developer's rights. (Docs. 26-1 at 7; 26-5 at 4). This assignment complied with the applicable terms of the Master CCRs and the Core Lease outlined above. (Doc. 26-10 at 10). At around the same time, the May Debtors executed a

promissory note in Ganymede's favor for $50,713,000 with interest accruing at 35% a year. (Doc. 26-1 at 8). Before the May Debtors filed their bankruptcy petition, they assigned a 20-acre portion of their rights under the Core Lease to the July Debtors ("the 20 Acre Transfer"). (Doc. 26-12 at 17).

After the 20 Acre Transfer, the May Debtors assigned an interest in the master developer's rights to Ganymede "as additional security" on the promissory note. (Doc. 25 at 13). The May Debtors eventually fell into default on the Ganymede note. (Doc. 26-1 at 9). Separately, the July Debtors also defaulted on two notes—for $26,000,000 and $3,700,000—executed in favor of an entity known as Pacific Coach, Inc. (*Id.*). Shortly before the Gray Entities filed their bankruptcy petitions, CPF acquired these promissory notes from Ganymede and Pacific Coach, Inc. (*Id.* at 8–9).

The bankruptcy court considered several competing reorganization plans for the Gray Entities and ultimately selected CPF's. (Doc. 26-1 at 61). It confirmed that plan, with required modifications, on May 1, 2018. (Doc. 26-2 at 2). Among other things, that plan vests the liquidating trustee—ROI—with the power to market and sell the "DR property" which specifically includes the master developer's rights. (*Id.* at 20–21, 50).[3] The plan further requires ROI to satisfy CPF's secured claim using proceeds from the sale "of the 96.5 Acre Lease, the 96.5 Acre Personal Property, and all related real property and personal property rights, including, but not limited to" the master developer's rights. (*Id.* at 41). The Gray Entities initially appealed the bankruptcy court's confirmation order, but voluntarily dismissed this appeal. (Doc. 25 at 17 n.7).

On November 20, 2018, Appellees filed a Joint Emergency Motion for Order to Show Cause, seeking to hold Appellants in contempt for, among other things, "wrongfully asserting control over" the master developer's rights. (Doc. 26-10 at 3). On this score, the joint motion generally alleged that Appellants were interfering with the terms of the confirmed plan by claiming that ROI could not market the master developer's rights

---

[3] The plan defined these rights as "those rights currently held by [May Debtors] under the 96.5 Acre Lease, as well as under all recorded covenants, conditions and restrictions relating to the 96.5 Acre Parcels . . . as the same may have been or may be amended or modified from time to time." (*Id.* at 27).

- 4 -

because the July Debtors held them as a result of the 20 Acre Transfer. (*Id.* at 8). The joint motion argued that the May Debtors held the master developer's rights, rendering them subject to ROI's control, asserting that the 20 Acre Transfer could not also have assigned the master developer's rights because it did not comply with the applicable provisions of the Master CCRs and the Core Lease discussed above. (*Id.* at 9–15). The joint motion sought an expedited hearing for these issues on November 27, 2018. (*Id.* at 2).

After Appellants objected to this hearing date, (Doc. 26-13), the bankruptcy court scheduled a hearing for December 13, 2018, and set deadlines for the parties to submit response and reply briefs, (Doc. 26-14 at 3). Appellants filed their response on December 4, 2018, urging the bankruptcy court to deny the joint motion's requested relief. (Doc. 26-15). Broadly, Appellants' response asked the bankruptcy court to deny Appellees' request for relief because (1) no court had ever been asked to determine the scope of the master developer's rights listed in the confirmed plan nor even whether they were assets of the bankruptcy estate; (2) the 20 Acre Transfer assigned the master developer's rights to the July Debtors and the confirmed plan contemplated such a transfer; (3) the bankruptcy court lacked jurisdiction to decide the scope of the master developer's rights; and (4) similarly, given pending litigation in the district court relating to similar issues, the bankruptcy court should refrain from deciding the scope of the master developer's rights. (*Id.* at 9–20).

Three days later, on December 7, the bankruptcy court issued an order to show cause to Appellants. (Doc. 26-16). The order directed them to show good cause why they should not be held in civil contempt for violating the confirmed plan in two ways:

> (i) refusing to surrender exclusive possession of all Assets of the May Liquidating Trust and May Debtors' Estates to the Liquidating Trustee; and (ii) interfering with implementation of the Plan by, among other things, *wrongfully asserting control over the [master developer's rights] owned by the May Debtors.*

(*Id.* at 3) (emphasis added). The arguments at the show-cause hearing largely tracked the parties' briefs, with Appellants urging the bankruptcy court not to hold them in contempt

because no court had ever determined the precise nature and scope of the master developer's rights. (Doc. 26-19 passim). They also asked the bankruptcy court to continue to refrain from making any decision about the master developer's rights in ruling on the contempt issue. (*Id.*). Appellees, for their part, argued that the bankruptcy court should hold Appellants in contempt because the May Debtors' bankruptcy estate clearly included the master developer's rights and Appellants were interfering with the implementation of the confirmed plan by making contrary representations to third parties. (*Id.* at 64–93).

After hearing these arguments, the bankruptcy court issued its ruling from the bench. (Doc. 26-19 at 104). The bankruptcy court began by clarifying a prior ruling declining to consider the scope of the master developer's rights, explaining that it had not done so because that dispute was between CPF and a non-debtor third-party over which the bankruptcy court believed it lacked jurisdiction under *Stern v. Marshall*, 564 U.S. 462 (2011). (*Id.* at 105). Proceeding to determine "whether the May Debtors transferred all or part of the [master developer's rights] to the July Debtors, or to any other entity," the bankruptcy court concluded that the master developer's rights "have been, and continue to be, held by the May Debtors." (*Id.* at 106, 114). It reasoned that the 20 Acre Transfer did not comply with the applicable provisions of the Master CCRs and the Core Lease, *see supra* pp. 2–3, meaning that it could not achieve an assignment of the master developer's rights. (*Id.* at 108–13). The bankruptcy court also rejected Appellants' argument that they could freely transfer the master developer's rights between affiliated entities under Article 17 of the Core Lease, because the provisions governing such transfers do not apply to purported assignments of the master developer's rights. (Docs. 20-2 at 12; 26-19 at 110)

Despite these conclusions, the bankruptcy court declined to "enter an order granting sanctions or to otherwise grant further relief" because "[t]he issue as to which estate held the [master developer's rights] had not been previously squarely addressed and ruled upon," meaning Appellants "may have had a good-faith belief that they own[ed] these rights and that they were proceeding in a legitimate fashion and not contrary to the confirmation order." (Doc. 26-19 at 115). The bankruptcy court instead issued an order

directing Appellants to cease and desist from:

> (a) exercising or attempting to exercise possession, dominion or control over any Assets of the May Debtors, including but not limited to the [master developer's rights], (b) representing to any person or entity that Gray currently has the power or any legal or equitable right to exercise any right, power, control or discretion as Master Developer . . . , (c) exercising any right, power or control over any other Assets of the May Debtors' Estates, and (d) taking any positions inconsistent with the Confirmation Order, the Plan, or this Order, or otherwise taking any other actions to interfere with the implementation of the Plan.

(Doc. 26-20 at 6). This appeal followed.

## II. DISCUSSION

### A. Standard of Review

This Court reviews legal questions, such as whether the bankruptcy court complied with the dictates of constitutional due process or had authority to finally adjudicate a claim, de novo. *Decker v. Tramiel (In re JTS Corp.)*, 617 F.3d 1102, 1109 (9th Cir. 2010); *In re Victoria Station Inc.*, 875 F.2d 1380, 1382 (9th Cir. 1989). The Court will accept any factual findings "unless 'the [C]ourt is left with the definite and firm conviction that a mistake has been committed.'" *In re JTS Corp.*, 617 F.3d at 1109 (citation omitted).

### B. Power of the Bankruptcy Court

Before turning to Appellants' due-process challenge, the Court must first address their contention that the bankruptcy court could not enter a final order or judgment to resolve the instant dispute, but instead needed to provide a federal district court with proposed findings of fact and conclusions of law before entry of judgment, an issue that the parties incorrectly label "subject matter jurisdiction." Characterizing the master developer's rights as entirely independent of the bankruptcy code, Appellants first contend this matter is a "non-core" proceeding, meaning that the bankruptcy court could not enter a final order or judgment. (Doc. 20 at 19–20). Appellants also argue Article III of the United States Constitution prevented the bankruptcy court from finally adjudicating the

contempt motion under *Stern*. (*Id.* at 20–21). Appellees counter that ruling on the order required the bankruptcy court to (1) clarify the property of the bankruptcy estate and (2) interpret and enforce the confirmed plan, two issues that the bankruptcy court could finally adjudicate. (Doc. 25 at 21–23).

A bankruptcy court's jurisdiction and its power to finally adjudicate certain claims are distinct but related concepts. "Like all federal courts, the jurisdiction of the bankruptcy courts is created and limited by statute." *Wilshire Courtyard v. Cal. Franchise Tax Bd. (In re Wilshire Courtyard)*, 729 F.3d 1279, 1284 (9th Cir. 2013) (citation omitted). By statute, bankruptcy cases and proceedings belong first in the district court, 28 U.S.C. § 1334, which may refer those proceedings to the bankruptcy court, 28 U.S.C. § 157(a). Bankruptcy courts thus have "subject matter jurisdiction over proceedings 'arising under [the bankruptcy code], or arising in or related to cases under [the bankruptcy code].'" *In re Wilshire Courtyard*, 729 F.3d at 1285 (citation omitted). Proceedings that "arise under" or "arise in" a case under the bankruptcy code are "core" proceedings, while proceedings "related to" a case under the bankruptcy code are "non-core" proceedings. *Stern*, 564 U.S. at 476–77. The distinction between "core" and "non-core" proceedings, although not going to subject matter jurisdiction, is important because

> [i]f a matter is core, the statute empowers the bankruptcy judge to enter final judgment on the claim, subject to appellate review by the district court. If a matter is non-core, and the parties have not consented to final adjudication by the bankruptcy court, the bankruptcy judge must propose findings of fact and conclusions of law. Then, the district court must review the proceeding de novo and enter final judgment.

*Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 34 (2014).

The Constitution also limits bankruptcy courts' ability to finally adjudicate certain claims, even when the bankruptcy code labels them "core." Because bankruptcy courts are not Article III courts, they cannot exercise "the 'judicial Power of the United States.'" *Id.* at 35 (quoting *Stern*, 564 U.S. at 487). "Congress may not bypass Article III simply because a proceeding may have some bearing on a bankruptcy case; the question is whether the

action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Stern*, 564 U.S. at 499. There is, however, a category of claims "involving *public rights*, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper." *Id.* at 488–89 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1856)) (emphasis added). "[W]hat makes a right 'public,'" and thus susceptible to final adjudication by a non-Article III court, "is that the right is integrally related to particular Federal Government action." *Id.* at 490–91.

Because the bankruptcy court did not submit proposed findings for district court review, this Court must begin by asking whether the proceeding was "core." If so, the Court must then determine whether the bankruptcy court could finally adjudicate it without exceeding Article III's limitations. If the answer to both inquiries is "yes," then the bankruptcy court did not exceed statutory or constitutional limitations on its power.

Initially, the Court notes that the parties have cited very little authority addressing the instant case's specific procedural context—a post-confirmation proceeding to determine whether a party has violated a reorganization plan. The pre-confirmation cases that the parties cite lack relevance here because, as the Ninth Circuit Court of Appeals has recognized, "post-confirmation bankruptcy jurisdiction is necessarily more limited than pre-confirmation jurisdiction." *Montana v. Goldin (In re Pegasus Gold Corp.)*, 394 F.3d 1189, 1194 (9th Cir. 2005). After confirmation, "retention of bankruptcy jurisdiction may be problematic" because, technically, "it is impossible for the bankrupt debtor's estate to be affected by a post-confirmation dispute" since the estate "ceases to exist once confirmation has occurred." *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 165 (3d Cir. 2004), *adopted by In re Pegasus Gold Corp.*, 394 F.3d at 1193–94. Appellees do, however, assert that this case falls under the bankruptcy court's jurisdiction "to interpret and enforce its own prior orders," like the confirmed plan here. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) (citing *Local Loan Co. v. Hunt*,

292 U.S. 234, 239 (1934)).

A court's jurisdiction to interpret or enforce prior orders is often called "ancillary jurisdiction." *Battle Ground Plaza, LLC v. Ray (In re Ray)*, 624 F.3d 1124, 1130–1131 (9th Cir. 2010). "Ancillary jurisdiction may rest on one of two bases: (1) to permit disposition by a single court of factually interdependent claims, and (2) to enable a court to vindicate its authority and effectuate its decrees." *Sea Hawk Seafoods, Inc. v. Alaska (In re Valdez Fisheries Dev. Ass'n, Inc.)*, 439 F.3d 545, 549 (9th Cir. 2006).

Appellants seemingly attempt to argue ancillary jurisdiction is lacking because the confirmed plan required no interpretation. (Doc. 20 at 20). This contention is unpersuasive; when Appellants began contending that the May Debtors had transferred the master developer's rights to July Debtors such that ROI could not sell them, it became necessary to clarify what the "rights currently held by [the May Debtors] under the 96.5 Acre Lease," (Doc. 26-2 at 27), actually were. That determination required examining how to effectively transfer the master developer's rights, under the Master CCRs and the Core Lease, which the plan had incorporated by reference. *See id.* Because Appellees called upon the bankruptcy court to determine whether Appellants had violated the terms of the confirmed plan, the proceeding fell under the second type of ancillary jurisdiction listed above.

When bankruptcy courts have exercised ancillary jurisdiction to stop violations of a confirmed plan, courts have reasoned that such proceedings qualify as "core" under the bankruptcy code. *ASARCO LLC v. Mont. Res., Inc.*, No. CV-11-79-BU-SEH, 2012 WL 12893405, at *2 (D. Mont. May 10, 2012); *Hawaiian Airlines, Inc. v. Mesa Air Grp., Inc.*, 355 B.R. 214, 218–19 (D. Haw. 2006) (collecting cases); *Huse v. Huse–Sporem, A.S. (In re Birting Fisheries, Inc.)*, 300 B.R. 489, 498–99 (B.A.P. 9th Cir. 2003); *JCF AFFM Debt Holdings. L.P. v. Affirmative Ins. Holdings, Inc. (In re Affirmative Ins. Holdings, Inc.)*, 565 B.R. 566, 580 (Bankr. D. Del. 2017); *Santander Consumer, USA, Inc. v. Houlik (In re Houlik)*, 481 B.R. 661, 678 (B.A.P. 10th Cir. 2012) (Brown, J., concurring). Actions to interpret or enforce a prior order are effectively a continuation of that earlier proceeding, thus if that earlier proceeding was "core," then the later one is too. *See McCowan v. Fraley*

*(In re McCowan)*, 296 B.R. 1, 3–4 (B.A.P. 9th Cir. 2003). Matters concerning the bounds of the bankruptcy estate necessarily "arise under" or "arise in" a case under the bankruptcy code, and therefore the proceedings that produced the confirmed plan were "core"—a fact which Appellants do not, and cannot, dispute—meaning subsequent proceedings to enforce those orders were "core" as well. *See, e.g.*, *In re Affirmative Ins. Holdings, Inc.*, 565 B.R. at 583–84; *Bakst v. Smokemist, Inc. (In re Gladstone)*, 513 B.R. 149, 156 (Bankr. S.D. Fla. 2014). Any other conclusion (i.e., that the bankruptcy court's ancillary jurisdiction is "non-core") would create an anomalous situation where the bankruptcy court would be forced to submit proposed findings for district-court approval to enforce its own orders, hindering its ability "to manage its proceedings, vindicate its authority, and effectuate its decrees," *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 379–80 (1994), and effectively rendering its ancillary jurisdiction a dead letter. Thus, the bankruptcy court possessed statutory authority to enter a final order here.

Next, the Court must consider whether entering a final order exceeded the limits that Article III places on the bankruptcy court. Many courts have reasoned that *Stern* does not affect the bankruptcy court's ability to interpret and enforce its own orders—a matter that is integrally related to the bankruptcy court's function. *See Musso v. OTR Media Grp., Inc. (In re Ladder 3 Corp.)*, 581 B.R. 7, 14 (Bankr. E.D.N.Y. 2018) (collecting cases); *Yelverton v. Marm (In re Yelverton)*, No. 09-00414, 2015 WL 276345, at *4 (Bankr. D.D.C. Jan. 20, 2015) ("Article III of the Constitution, as interpreted in *Stern*, does not preclude the bankruptcy court form enforcing an order that it had authority to issue."); *Schermerhorn v. Centurytel, Inc., (In re Skyport Glob. Commc'ns, Inc.)*, No. 08-36737-H4-11, 2013 WL 4046397, at *40 (Bankr. S.D. Tex. Aug. 7, 2013) (collecting cases); *In re Garrett-Beck Corp.*, No. 09-3774, 2012 WL 3727318, at *1 (Bankr. S.D. Tex. Aug. 27, 2012). This conclusion is reinforced by the fact that the relief requested required the bankruptcy court to reiterate "what is and is not property of the estate, a decision central to the mission of the bankruptcy court." *In re Gladstone*, 513 B.R. at 159. Resolving such matters may frequently require the bankruptcy court to consider state-law issues, *see id.* at 156 (citing

*Butner v. United States*, 440 U.S. 48 (1979)), and *Stern* cannot be read to disturb the bankruptcy court's traditional role to carry out that task, *see Stern*, 564 U.S. at 502 (emphasizing that nothing in the opinion "meaningfully changes the division of labor" between district and bankruptcy courts).[4] In other words, not only is the ability of the bankruptcy court to enforce its own orders a matter integrally related to a core function of that court but, when those efforts implicate the confirmed plan, the proceeding also "stems from the bankruptcy itself" such that *Stern* does not preclude final adjudication. *See Stern*, 564 U.S. at 499.

Accordingly, the bankruptcy court had the authority to enter a final order on the dispute over the master developer's rights.

**C. Due Process and the Rules of Bankruptcy Procedure**

Appellants primary argument on appeal is that the bankruptcy court denied them due process when it determined that the May Debtors held the master developer's rights because any such determination required holding an "adversary proceeding" under Federal Rule of Bankruptcy Procedure ("Rule") 7001 and could not proceed as a mere "contested matter" under Rule 9001. (Doc. 20 at 13–17). In other words, Appellants premise their constitutional claim on the fact that the Rules direct the bankruptcy court to follow certain procedures—including requiring a longer time for briefing and imposing certain disclosure obligations—when it makes certain determinations and the failure of the bankruptcy court to apply those procedures here deprived Appellants of notice and an opportunity to be heard. Appellees argue in response that the proceedings here fully afforded Appellants the process they were due and, if they did not, any error was harmless. (Doc. 25 at 18–21).

"For all its consequence, 'due process' has never been, and perhaps can never be, precisely defined." *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 24 (1981). The touchstone of due process is "fundamental fairness." *Walters v. Nat'l Ass'n of Radiation Survivors*,

---

[4] Although the Ninth Circuit Court of Appeals has not opined on this specific issue, the Court further notes that this conclusion is consistent with that court's approval of the Bankruptcy Appellate Panel's narrow reading of *Stern*. *Deitz v. Ford (In re Deitz)*, 760 F.3d 1038, 1043–46 (9th Cir. 2014) (mem.) (explaining that the "majority of decisions rendered since *Stern* follow Chief Justice Robert's admonition that the decision be applied narrowly"); *see also* 1 Collier on Bankruptcy ¶ 3.02 (16th ed. 2019).

- 12 -

473 U.S. 305, 320–21 (1985). A fundamentally fair proceeding requires notice and an "opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citation omitted); *Conner v. City of Santa Ana*, 897 F.2d 1487, 1492 (9th Cir. 1990) ("The fundamental requirements of procedural due process are notice and an opportunity to be heard . . . ."). This flexible concept may require different procedures depending on the interests at stake, *Mathews*, 424 U.S. at 334, but ultimately the "standard for what amounts to constitutionally adequate notice . . . is fairly low; it's 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objection,'" *Espinosa v. United Student Aid Funds, Inc.*, 553 F.3d 1193, 1202 (9th Cir. 2008) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)). That standard does not require actual notice. *Dusenberry v. United States*, 534 U.S. 161, 171 (2002). The purpose of the notice requirement "is to apprise the affected individual of, and permit adequate preparation for, an impending 'hearing.'" *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 14 & n.15 (1978) (collecting cases).

Because Appellants ground their due process arguments in their claim that the scope of the master developer's rights could be determined only in an adversary proceeding and not in a contempt proceeding (which is a contested matter) it is useful to first understand some of the differences between the two before turning to the merits of Appellants' due process challenge. Bankruptcy procedure distinguishes "between different types of litigated matters and divide[s] them into contested matters and adversary proceedings." 10 Collier, *supra*, at ¶ 7000.01. "Adversary proceedings are separate lawsuits within the context of a particular bankruptcy case and have all of the attributes of a lawsuit, including the filing and service of a formal complaint and application, with certain modifications, of the Federal Rules of Civil Procedure . . . ." *Id.* at ¶ 7001.01. Contested matters, on the other hand, proceed via motion. *Id.* Some of the Rules applicable to adversary proceedings that give them the flavor of a fully-fledged civil lawsuit also apply to contested matters, and the bankruptcy court can apply more of those Rules in a contested matter at its discretion. *Id.*

at ¶ 9014.06. Perhaps the most significant differences between the two are that contested matters aim to resolve issues with greater speed than adversary proceedings and presumptively do not apply certain disclosure rules. *Id.*; *see also In re Fagan*, 559 B.R. 718, 725 (Bankr. E.D. Cal. 2016).

The list in Rule 7001 defines what kinds of proceedings must be treated as "adversary proceedings." Fed. R. Bankr. P. 7001. A matter not listed is a contested matter. *See Barrientos v. Wells Fargo Bank, N.A.*, 633 F.3d 1186, 1189 (9th Cir. 2011). Subject to exceptions not relevant here, a "proceeding to determine the validity, priority, or extent of . . . [an] interest in property," like the master developer's rights, is an adversary proceeding. Fed. R. Bankr. P. 7001(2); 10 Collier, *supra*, at ¶ 9014.06. Contempt proceedings are not listed "and are therefore contested matters not qualifying as adversary proceedings." *Barrientos*, 633 F.3d at 1190.

At the outset, the Court believes that Appellants' contention that failure to proceed under Rule 7001 can by itself form the basis for a procedural due process claim somewhat misstates the law. (Doc. 20 at 14). Rule-conferred procedures typically are in addition to the relatively low requirements of constitutional due process. Thus, the Court observes that the inquiry is more properly framed in the following way: When a court fails to follow the process contemplated by procedural rules, a reviewing court need not reverse or relieve a party from a judgment if the proceeding still afforded due process to the parties. *Brawders v. Cty. of Ventura (In re Brawders)*, 503 F.3d 856, 870 (9th Cir. 2007); *Tully Constr. Co. v. Cannonsburg Envtl. Assocs. (In re Cannonsburg Envtl. Assocs.)*, 72 F.3d 1260, 1264–65 (6th Cir. 1996); 10 Collier, *supra*, at ¶ 9014.01 ("Occasionally, a party who should have commenced an adversary proceeding may instead file a motion under Rule 9014. In such cases, so long as due process has been afforded to the responding party, the courts will apply the harmless error rule and not force the parties to start all over again."); *see also Strata Title, L.L.C. v. Pure Country Tower, LLC (In re Strata Title, L.L.C.)*, BAP No. AZ-13-1291-PaKuD, 2014 WL 661174, at *11 (B.A.P. 9th Cir. Feb. 21, 2014) ("The due process requirements Debtor invokes are satisfied in both adversary proceedings under

Rule 7001 and contested matters under Rule 9014.").

*GMAC Mortgage Corp. v. Salisbury (In re Loloee)*, 241 B.R. 655 (B.A.P. 9th Cir. 1999), the principal case that Appellants rely on, follows that analysis. There, the bankruptcy court erroneously determined the priority of certain liens via a motion to sell real property, not an adversary proceeding as required. *Id.* at 657–58. When the aggrieved lienholder—GMAC—appealed, the Bankruptcy Appellate Panel explained "[m]erely erroneous procedure and notice" may not support relief absent a due-process violation. *Id.* at 660. The error in *In re Loloee* went well beyond mere failure to conduct an adversary proceeding because: (1) "GMAC was not served a copy of the motion papers that arguably suggested that there may be a lien priority issue;" (2) GMAC did not receive any document that might have indicated lien priority would be determined until after its deadline to oppose the sale; and (3) the bankruptcy court resolved the lien priority issue ex parte and without holding a hearing one day before the time set for the hearing. *Id.* at 662.

The record here demonstrates that Appellants' experience in the bankruptcy court was far different from GMAC's in *In re Loloee*. The only similarity between the two cases is that the bankruptcy court decided an issue in a contested matter that involved a property right when the Rules contemplate using an adversary proceeding to do so, which does not itself suffice to establish a due-process violation. Contrary to Appellants' contention, the record here shows that Appellees' failure to file an adversary proceeding did not deprive Appellants of any notice that the bankruptcy court would even consider, let alone decide, which entities owned and controlled the master developer's rights.

To begin with, Appellees filed their Joint Motion for Order to Show Cause on November 20, 2018, specifically seeking an order to stop Appellants from "interfering with the implementation of the Plan by, among other things, wrongfully asserting control over" the master developer's rights "owned by the May Debtors." (Doc. 26-10 at 3). *Compare In re Loloee*, 241 B.R. at 661 (considering the fact that moving papers were "at best, ambiguous" as contributing to lack of notice), *with Diatom, LLC v. Comm. of Creditors Holding Unsecured Claims (In re Gentile Family Indus.)*, BAP No. CC-13-1563-KiTaD,

2014 WL 4091001, at *6 (B.A.P. 9th Cir. 2014) (considering the fact that the motion was clear as to the relief sought in concluding any error was harmless). Appellants' response to the joint motion demonstrated their awareness of that disputed issue, arguing that the July Debtors owned the master developer's rights such that Appellants could not be found to have wrongly asserted control over them. (Doc. 26-15 at 9–11). Further, the Order to Show Cause described the issues to be addressed at the hearing by quoting, verbatim, the aforementioned language from Appellees' joint motion. (Doc. 26-16 at 3).[5] Finally, at the hearing held on December 13, 2018, most of the argument centered on whether the 20 Acre Transfer validly assigned the master developer's rights under the Master CCRs and the Core Lease.

These facts show that, at all times in the 23-day period between the joint motion's filing and the show-cause hearing, all relevant parties understood that one of the main issues to be decided at the hearing was whether the May Debtors owned the master developer's rights when they filed their bankruptcy petition. Put another way, these filings make clear that the operative question at the hearing would be on what grounds did the July Debtors base their claim to the master developer's rights such that they had not violated the confirmed plan? These facts belie any contention that Appellants were never even apprised of the issues to be decided and had no opportunity to adequately prepare. How the bankruptcy court could have determined whether Appellants were wrongfully asserting control over the master developer's rights "owned by the May Debtors" without reference to the ownership of those rights is a mystery for which Appellants have no explanation.

Appellants' arguments to the contrary that are based on acts that the bankruptcy court took before the joint motion are unavailing. Under this banner, Appellants argue that the bankruptcy court's prior order declining to define the scope of the master developer's rights gave them reason to believe that the bankruptcy court would do the same throughout the case. (Doc. 20 at 8–9, 11). Appellants' argument proceeds from the flawed premise that

---

[5] Although the Order to Show Cause did not specifically include this language, the Court also notes that Appellees' prayer for relief is replete with requests for the bankruptcy court to decide that the May Debtors owned the master developer's rights before they filed their petition. (Doc. 26-10 at 20–21).

- 16 -

the bankruptcy court's ruling rejected for all time the idea that it would interpret the Master CCRs and the Core Lease. (*Id.*). Actually, the bankruptcy court never made that ruling; instead, the transcript of the hearing makes clear that the bankruptcy court's concern was with the fact that the dispute about the master developer's rights at issue in the prior proceeding involved a non-debtor third-party entity, and thus had very little to do with the actual bankruptcy case. *See, e.g.*, Transcript of Hearing at 7–8, 15–16, 48, 63–64, *High Street Buildings LLC v. Atkins* (D. Ariz. Dec. 4, 2018) (No.18-03567), ECF No. 18-12. Nothing about that decision indicates that the bankruptcy court would abstain forever from determining (or, in this case, clarifying) the ownership of the rights vis-à-vis the parties to the bankruptcy.

Likewise, to the extent that Appellants argue that the bankruptcy court's statement at the hearing that "this issue hasn't really fairly been teed up" somehow undermined (or was a comment on) the notice given prior to the hearing, they cite no authority for this novel proposition. (Docs. 20 at 11, 17; 28 at 3). At any rate, the Court rejects this argument. Again, its premise is incorrect. Before making the statement, the bankruptcy court stated that it was "mindful that we should proceed cautiously *when it comes to matters of contempt*." (Doc. 26-19 at 91) (emphasis added). Placing the quote in its proper context thus reveals that it was the issue of contempt that had not "fairly been teed up," not the issue of whether the 20 Acre Transfer also accomplished a transfer of the master developer's rights. The bankruptcy court was simply expressing caution about the scope of relief that Appellees could obtain.[6]

It is also important to note what Appellants do not argue. They do not show that they "at any time formally requested that the bankruptcy court conduct an evidentiary hearing." *See In re Strata Title, L.L.C.*, 2014 WL 661174, at *9. Nor do they articulate with any specificity how the hearing, and ultimate outcome, might have been different had

---

[6]Appellants make much of the fact that the bankruptcy court determined the ownership issue after ruling that it would not hold them in contempt. (*See, e.g.*, Doc. 20 at 11–13). This conflates the issue of whether Appellees "*willfully* violated" the confirmed plan with the issue of whether they violated the confirmed plan at all, which was necessarily at issue in the proceedings in the bankruptcy court.

Appellees initiated an adversary proceeding. *Id.* (quoting *Ruvacalba v. Munoz (In re Munoz)*, 287 B.R. 546, 551 (B.A.P. 9th Cir. 2002)).[7] Although Appellants vaguely assert that there was a factual dispute and that dispute required discovery[8] and evidence to resolve, the fact is that Appellants argued before the bankruptcy court that the July Debtors owned the master developer's rights because they are freely assignable between affiliates under the Core Lease. As all involved seemed to understand, this dispute turned on the interpretation of the Master CCRs and the Core Lease—a legal question that did not require evidence beyond those documents to resolve. *RNI-NV Ltd. P'ship v. Field (In re Maui Indus. Loan & Fin. Co.)*, 580 B.R. 886, 896 (D. Haw. 2018).

Nor even do Appellants counter the contention that they had consistently informed all interested parties, and the bankruptcy court, that the May Debtors owned the master developer's rights. (Doc. 25 at 8). Instead, Appellants argue that events since the bankruptcy court selected a plan justified their change in position.[9] (*See* Docs. 26-15 at 10–11; 28 at 6). They acknowledge further that positional change precipitated the need for the

---

[7] Appellants do mention that the "bankruptcy court expressed its doubts" over the validity of CPF's claim on the master developer's rights. (Doc. 20 at 18 n.11). But they do not explain how that somehow undermined the notice that the bankruptcy court eventually gave in this matter, which placed those rights squarely at issue. Nor do they explain how the bankruptcy court's earlier doubts show that the bankruptcy court's later resolution would have been different if Appellees had filed an adversary proceeding.

[8] Appellants emphasize the lack of discovery here. This position is confusing because

> the Constitution does not create an entitlement to discovery. See *Weatherford v. Bursey,* 429 U.S. 545, 559 (1977). Even in criminal prosecutions, the constitutional disclosure obligation is limited to evidence favorable to the accused, see *Brady v. Maryland,* 373 U.S. 83 (1963)—and for impeaching evidence this is a right to disclosure at trial, not a right to discovery before trial. See *United States v. Ruiz,* 536 U.S. 622, 629–33 (2002).

*Young v. Holder*, 462 F. App'x 626, 628 (7th Cir. 2012).

[9] Additionally, it is not at all clear how the claimed change in circumstances—the July Debtors' exercise of their redemption rights under the plan—meant that the May Debtors' bankruptcy estate no longer included the master developer's rights. Aside from citing no language in the controlling documents to support this assertion, it does nothing to change the fact that if the May Debtors never validly transferred the master developer's rights, those rights remained with the May Debtors.

hearing in the first place. (Doc. 28 at 5–6.). This acknowledgement flies in the face of their claim that they had no idea that the ownership of the master developer's rights would be at issue in a hearing prompted by that very change.[10]

Accordingly, the Court is confident that Appellants received the process that was their due despite any technical lack of compliance with the Rules.

**III. CONCLUSION**

For these reasons,

IT IS ORDERED that the bankruptcy court's Order Resolving Motion for Order to Show Cause is AFFIRMED.

IT IS FURTHER ORDERED, pursuant to Federal Rule of Bankruptcy Procedure 8024(a), that the Clerk of the Court shall enter judgment accordingly.

Dated this 4th day of March, 2020.

_____
James A. Teilborg
Senior United States District Judge

---

[10] The Court notes that Appellants have never challenged the terms of the confirmed plan. That plan is a final judgment, *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 269 (2010), and Appellants waived their ability to challenge its terms by voluntarily dismissing the direct appeal. To the extent that Appellants seek to change the terms of the confirmed plan, the effort is untimely.

- 19 -